**KAHN SWICK & FOTI, LLC**
Kim E. Miller (SBN 178370)
kim.miller@ksfcounsel.com
1901 Avenue of the Stars, 2nd Floor
Los Angeles, California 90067
Telephone: (504) 455-1400

Lewis Kahn
lewis.kahn@ksfcounsel.com
Melissa H. Harris
melissa.harris@ksfcounsel.com
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400

[*Additional counsel on signature page*]

*Counsel for Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DYWANNA DRUMMER, ANTHONY D'ANTONIO, SCHALISE LEE, CYNTHIA RUBIO, and MARY LEE WALLACE, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>        v.<br><br>COSTAR GROUP, INC.<br><br>                    Defendant. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>1. Violation of California Invasion of Privacy Act (CAL. PENAL CODE §638.51)<br><br>JURY TRIAL DEMANDED |

Plaintiffs Dywanna Drummer, Anthony D'Antonio, Schalise Lee, Cynthia Rubio, and Mary Lee Wallace ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to allegations specifically pertaining to themselves, which are based on personal knowledge. This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), and personal jurisdiction over all parties. Plaintiffs reside in California and Plaintiff Drummer resides in this District. Defendant directed activities to California by purposefully tracking individuals through its websites and maintaining offices in California and in this District.

## **NATURE OF THE CASE**

1.      This is a class action against Defendant CoStar Group, Inc. ("CoStar" or "Defendant") for violating California laws intended to protect individuals' privacy rights.

2.      Unbeknownst to its users, CoStar has partnered with various third parties, including TikTok and LinkedIn, to install sophisticated tracking software on the landing pages of the websites it operates.

3.      Through the use of pixels, cookies, code snippets, and other technologies, these trackers surreptitiously capture and disclose CoStar website

visitors' internet protocol addresses and other personal information to third parties for targeted marketing, advertising, and analytic purposes.

4.     Because the trackers capture website visitors' "routing, addressing, or signaling information" without their consent or a court order, the trackers constitute illegal "pen registers" under California's Invasion of Privacy Act ("CIPA"), CAL. PENAL CODE § 638.51.

5.     Plaintiffs bring this action to recover statutory and compensatory damages for harm caused to Plaintiffs and other class members and to prevent Defendant from further violating the privacy rights of California residents.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class, and at least one member of the Class is a citizen of a different state than Defendant.

7.     This Court has personal jurisdiction over Defendant because Defendant has purposefully directed its activities to California by regularly tracking individuals in California through its websites, including but not limited to Apartments.com and Homes.com, and Defendant conducts substantial business in California by operating eight offices in California, including four within this District.

8.      Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because (1) Defendant is subject to personal jurisdiction and resides in this District; and (2) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## **THE PARTIES**

9.      Plaintiff Dywanna Drummer is, and has been at all relevant times, a resident and citizen of California, residing in the city of Lancaster, within the Central District of California. Ms. Drummer has visited the Apartments.com website numerous times, including on or about February 8, 2025.

10.      Plaintiff Schalise Lee is, and has been at all relevant times, a resident and citizen of California, residing in the city of Elk Grove. Ms. Lee visits the Apartments.com website once or twice a month, including in or about January 2025.

11.      Plaintiff Cynthia Rubio is, and has been at all relevant times, a resident and citizen of California, residing in the city of Bakersfield. Ms. Rubio has visited the Apartments.com website numerous times, including on or about January 27, 2025.

12.      Plaintiff Mary Lee Wallace is, and has been at all relevant times, a resident and citizen of California, residing in the city of Bakersfield. Ms. Wallace visits the website Homes.com on a weekly basis, including on or about January 25, 2025.

13.    Plaintiff Anthony D'Antonio is, and has been at all relevant times, a resident and citizen of California, residing in the city of Mountain View. Mr. D'Antonio has visited the Homes.com website multiple times, including on or about March 3, 2025.

14.    Defendant CoStar is, and has been at all relevant times, a publicly-traded Delaware corporation with its principal place of business located at 1201 Wilson Blvd., Arlington, Virginia. CoStar provides real estate information, analytics, and marketing services to the commercial property industry in North America and Europe. CoStar maintains eight offices in California, including four within the Central District of California.

## FACTUAL ALLEGATIONS

### CIPA

15.    The California Legislature enacted CIPA to protect certain privacy rights of California citizens, expressly recognizing that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." CAL. PENAL CODE § 630.

16.    To that end, CIPA prohibits, *inter alia*, "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order." CAL. PENAL

CODE § 638.51.

17.    A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by a facility from which a wire or electronic communication is transmitted, but not the contents of a communication." CAL PENAL CODE § 638.50(b).

18.    CIPA provides for a private right of action and imposes civil liability and statutory penalties for its violation in the amount of $5,000 per violation. CAL. PENAL CODE § 637.2(a)(1).

**Defendant's Surreptitious Installation and Use of Third-Party Trackers**

19.    CoStar owns and operates multiple real estate websites, including but not limited to Apartments.com and Homes.com (the "Websites"). While Apartments.com and Homes.com were utilized by the named Plaintiffs, on information and belief, several other websites operated by CoStar, including Loopnet, Land.com, BizBuySell, and Ten-x, are also violating CIPA in a similar manner.

20.    When a user visits one of the Websites, whether on a computer or a mobile device, his or her browser sends an "HTTP request" or a "GET" request to CoStar's servers, and CoStar responds with an "HTTP response" back to the browser with a set of instructions of how to load and display the Website content.

21.    The HTTP response also causes third-party Trackers to be installed on

5

the user's browser. The Trackers then cause the browser to send the Trackers identifying information, including the user's unique IP address and other information. The Trackers also store cookies in the users' browser caches, a form of temporary storage.[1]

22.    On subsequent visits to the Website(s), the Trackers locate the cookie identifier and cause the browser to again send the cookie, along with the user's IP address, to the third-party.[2]

23.    Cookies are small computer files that are automatically generated when a user visits a website, comprised of strings of text that contain information, such as user IDs, emails, or IP addresses. There are two types of cookies: first-party and third-party. First party cookies are created and stored directly by the web server of a website that a user is visiting, primarily in order to improve website functionality and the user's experience. By contrast, third party cookies are placed on the website by someone other than the owner of the website to collect user data and are often used by marketing companies or ad networks for tracking and/or advertising purposes. Unlike first-party cookies, which only gather user data when users interact

[1] *See* "Web cache," PC MAG, https://www.pcmag.com/encyclopedia/term/web-cache (defining cache as "a folder full of Web pages in the user's computer that is maintained by the Web browser for a period of time") (last visited Apr. 29, 2025).

[2] In the event that a user clears his or her cookies, the Tracker(s) will be wiped from his or her browser cache, and the next time he or she visits the Website(s), the process will begin all over again.

with the owner's website, third-party cookies track users across multiple websites to provide a more comprehensive picture of users' behavior.[3]

24.    An IP address is a unique identifier, or address, for an internet-connected device that is expressed as four sets of numbers separated by periods. The first two sets of numbers indicate the network the device is connected to, and the second set of numbers identify the specific device being used. An IP address contains geographical location information and can be used to determine the state, city, and zip code where the device is located at a particular point. Collection of IP addresses allows third parties to obtain personally identifying, non-anonymized information. Thus, an IP address allows a company to target advertisements towards customers based on their geographic location.

25.    The Trackers CoStar has installed on its Websites enable it and third parties, such as TikTok and LinkedIn, to analyze the data collected from Website users to more accurately target advertising and to analyze and optimize the performance of marketing campaigns – for the ultimate goal of CoStar earning additional revenue.

26.    The personal information obtained and distributed by CoStar has significant economic value as consumers' personal information is viewed as a form

---

[3] https://www.techtarget.com/whatis/definition/third-party-cookie (last visited Apr. 29, 2025); *see also* "Cookie," PC MAG, https://www.pcmag.com/encyclopedia/term/cookie (last visited Apr. 29, 2025).

of currency in the e-commerce industry. Consumers, like Plaintiffs and all members of the putative Class, suffer economic injury as a result of CoStar's access and use of their personal information.

27.    Because the trackers capture website visitors' "routing, addressing, or signaling information" (in the form of their IP addresses) without their consent or a court order, they constitute illegal "pen registers" under CIPA. CAL. PENAL CODE § 638.51.

**TikTok Pixel**

28.    One of the Trackers installed by Defendant on one or more of its Websites, including Apartments.com, is TikTok Pixel.

29.    TikTok is a highly popular Chinese video-sharing platform that debuted in 2016 and is now one of the most popular social media networks in the world.  In 2024, it reached 1.6 billion active users, making it the fifth largest social app by users.[4] TikTok has approximately 136 million adult users in the United States.[5]

30.    TikTok offers a variety of "tools that allow businesses to share marketing data with TikTok for measurement and ad performance."[6] One of these

[4]  https://www.businessofapps.com/data/tiktok-app-report/ (last visited Apr. 29, 2025).

[5] https://www.theglobalstatistics.com/us-tiktok-users-statistics/ (last visited Apr. 29, 2025).

[6] https://ads.tiktok.com/help/article/get-started-pixel?redirected=1 (last visited Apr. 29, 2025).

tools is TikTok Pixel, which is a "piece of code" a website operator can place on its website to measure website traffic and ad campaign performance, optimize ad campaigns, and find new customers.[7]

31.    One of the cookies that the TikTok Pixel installs on a user's browser when they access one of CoStar's Websites is known as the "_ttp" cookie. The _ttp cookie contains a string of numbers and letters which is unique to each user's browser. This functions like a digital fingerprint, similar to how a social security number is unique to each person.

32.    The persistent nature of the _ttp cookie allows TikTok to maintain continuous tracking of users across multiple browsing sessions by linking new IP addresses to the unique _ttp cookie. While a user's public IP address may change between Website visits (for instance, when accessing the Website from different locations), the identifier associated with the _ttp cookie remains constant for approximately 13 months,[8] unless a user manually "clears" their cookies (upon which the TikTok Pixel will automatically generate a new, unique _ttp cookie).

33.    The _ttp cookie is particularly invasive because it also enables retroactive and cross-device tracking. If a user visits the Website before ever creating a TikTok account, the _ttp cookie begins collecting their browsing data and public

---

[7] https://ads.tiktok.com/help/article/tiktok-pixel (last visited Apr. 29, 2025).

[8]  https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en  (last visited Apr. 29, 2025).

IP addresses. Later, if that user creates a TikTok account or logs into an existing account on a device where the _ttp cookie is present, TikTok can retroactively associate all previously collected data with their newly identified profile. This means that for the more than 100 million Americans who have TikTok accounts, their past Website activities, including historical public IP addresses and location information, can be linked to their identities even if those activities occurred before they created their TikTok accounts. Further, once a user logs into TikTok on multiple devices (such as a smartphone and a laptop), TikTok can link the separate _ttp cookies on each device to the same user profile, creating a comprehensive record of that user's Website activities across all their devices.

34.    Through these mechanisms, the TikTok Pixel engages in a process of "fingerprinting" each user who browses the Website. When a user visits the Website, TikTok collects their IP address and automatically associates it with any existing _ttp cookie on their browser. The process, which occurs regardless of whether the user has a TikTok account, enables TikTok to link multiple IP addresses to the same user over time, creating a comprehensive record of the user's geographic locations and Website activities across all their devices. The "fingerprinting" process allows TikTok to share with Defendant both the approximate location (derived from public IP addresses) and the identity of Website users.

35.     The following are screenshots reflecting the _ttp cookie installed on a user's browser while browsing the Apartments.com website:



1



| Name | Scope | Dom |
|---|---|---|
| _ttp | Third Party | .tikt |
| from_way | Third Party | .tikt |
| tta_attr_id_mirror | Third Party | .tikt |
| passport_csrf_token | Third Party | .tikt |
| reauth_token_ss | Third Party | .tikt |
| tta_attr_id | Third Party | .tikt |
| sso_uid_tt_ss_ads | Third Party | .tikt |
| sso_user_ss_ads | Third Party | .tikt |
| ssid_ucp_sso_v1_ads | Third Party | .tikt |
| ttwid | Third Party | .tikt |
| uid_tt_ss_ads | Third Party | .tikt |
| sessionid_ss_ads | Third Party | .tikt |
| ssid_ucp_v1_ads | Third Party | .tikt |
| msToken | Third Party | .tikt |

**Cookie Value** ☐ Show URL-decoded
2erCExpEkZ0hDIFk5Qiy3uJnEd5

**Description**
Tracking cookie used by TikTok to identify a visitor

36.    TikTok Pixel collects the following information available via standard

web browsers:

- Ad/Event Information: Information about the ad a person on TikTok
  has clicked on or an event that was initiated.

- Timestamp: Used to determine when website actions took place, like
  when a page was viewed or when a product was purchased.

- IP Address: Used to determine the geographic location of an event.

- User Agent: Used to determine the device make, model, operating

system, and browser information.

- Cookies: Used to help with the measurement, optimization, and targeting of your campaigns.

- Metadata & Button Clicks: Includes descriptive page metadata, structured microdata, page performance data, and button clicks.[9]

37.     Website operators such as Defendant retain control over the data collected and reported by the TikTok Pixel through TikTok Events Manager, which is "a workspace to create and manage data connections with TikTok, no matter where they take place (on your website or app, in-store or via your CRM)."[10] "Events" are "actions taken on your website, like adding an item to a cart or making a purchase."[11] Sharing of events with TikTok can help measure campaign performance, optimize ad delivery, and build marketing audiences.

38.     Further, if a Website visitor is logged in to a TikTok account, the cookies can be used to link the data shared to the user's TikTok profile, which can be further used for analytics or advertising purposes.

39.     TikTok Pixel also recommends the use of "Automatic Advanced Matching," which is a feature that automatically collects customer data (such as a

---

[9] https://ads.tiktok.com/help/article/tiktok-pixel (last visited Apr. 29, 2025).

[10]   https://ads.tiktok.com/help/article/about-tiktok-events-manager?lang=en   (last visited Apr. 29, 2025).

[11]                                   https://ads.tiktok.com/help/article/standard-events-parameters?aadvid=7400761136813228048&lang=en (last visited Apr. 29, 2025).

phone number or address) entered into a form on a website "to link event information to people on TikTok."[12] "Tiktok may use matched events to better attribute events to TikTok ads, optimize advertisers' future campaigns, and, depending on advertisers' and users' settings, TikTok may also add people to advertisers' retargeting or engagement audiences."[13]

40.    "Advanced Matching, combined with first- and third-party cookies, ensures the best possible matching, especially as third-party cookies face deprecation."[14]

41.    On information and belief, CoStar has enabled TikTok's Automatic Advanced Matching feature and, therefore, in addition to IP addresses and other identifying browser information, it also captures any form data inputted by users on the Websites, such as the user's name, date of birth, and address.[15]

42.    The following are screenshots demonstrating the operation of TikTok Pixel's Automatic Advanced Matching while browsing on Apartments.com. In the image below, the Advanced Matching value is set to "true," showing that the

---

[12]    https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Apr. 29, 2025).

[13] *Id.*

[14] https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en (last visited Apr. 29, 2025).

[15] In addition, "Automatic Advanced Matching activates when a designated event occurs on a page where Pixel is installed." https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Apr. 29, 2025).

Advanced Matching feature is operating on the Apartments.com website. Further, the images reflect the various transmissions sent to TikTok, adding to its collection of user behavior:







**LinkedIn Insight Tag**

43.    A second third-party Tracker installed by Defendant on one or more of its Websites, including Apartments.com and Homes.com, is the Insight Tag from LinkedIn.

44.    "LinkedIn is the world's largest professional network on the internet," with over 850 million users,[16] 230 million of whom are in the United States.[17] People use the LinkedIn platform to find jobs and create and strengthen professional connections. LinkedIn users set up individual profiles, which generally contain information such as an individual's name, place of work, contact information, educational background, and other personal information.[18]

45.    LinkedIn touts its advanced marketing and advertising capabilities, offering a variety of tools that businesses can use to "tap into [their] powerful professional demographics data" and "[r]each [their] target audience with precision and scale."[19]

46.    One such tool is the LinkedIn Insight Tag. "The LinkedIn Insight Tag

[16]    https://www.linkedin.com/help/linkedin/answer/a548441/what-is-linkedin-and-how-can-i-use-it-?lang=en    (last    visited    Apr.    29,    2025);
https://news.linkedin.com/2022/july/linkedin-business-highlights-from-microsofts-fy22-q4-earnings (last visited Apr. 29, 2025).

[17]    https://aitechtonic.com/how-many-people-use-linkedin/ (last visited Apr. 29, 2025).

[18]    https://www.linkedin.com/help/linkedin/answer/a564064/ (last visited Apr. 29, 2025).

[19]    https://business.linkedin.com/marketing-solutions/audience (last visited Apr. 29, 2025).

is a snippet of JavaScript code that loads a small library of functions [website operators] can use to track LinkedIn ad-driven visitor activity on [their] website[s]."[20] LinkedIn claims the Insight Tag "can help [websites] optimize [their] campaigns, retarget [their] website visitors, and learn more about [their] audiences."[21]

47.    Like TikTok Pixel, the LinkedIn Insight Tag relies on cookies,[22] which are installed on a visitor's web browser when they visit one or more of Costar's Websites.[23]

48.    The specific user data captured by the Insight Tag by default includes: URL, buttons clicked, referrer, IP address, device and browser characteristics (User Agent), and timestamp.[24]

49.    One important feature of the Insight Tag is the "enhanced conversion tracking" feature. Through use of this feature, the Insight Tag behaves as a first-party cookie, rather than a third-party cookie, which means that it can avoid privacy

---

[20] https://business.linkedin.com/marketing-solutions/insight-tag (last visited Apr. 29, 2025).

[21] *Id.*

[22] https://business.linkedin.com/marketing-solutions/insight-tag#tag-manager (last visited Apr. 29, 2025); *see also* https://www.linkedin.com/legal/cookie-policy (last visited Apr. 29, 2025).

[23] https://www.linkedin.com/help/lms/answer/a489169 (last visited Apr. 29, 2025),

[24] https://business.linkedin.com/marketing-solutions/insight-tag (last visited Apr. 29, 2025).

settings in users' browsers that block third-party cookies. As LinkedIn explains, because "[s]ome browsers have already started blocking 3rd party cookie tracking by default (including Safari, Firefox), and others (such as Chrome) announced plans to do so in the near future[,] [i]t's important for advertisers to prepare for these changes by switching to Javascript tags and enabling 'enhanced conversion tracking' in the Insight Tag settings to continue capturing signals where 3rd party cookies are blocked."[25]

50.     In addition, the Insight Tag "enables [LinkedIn] to match [ ] website visitors to their respective LinkedIn member accounts."[26] Once a website visitor has been matched to their LinkedIn profile, LinkedIn "can tally their actions in Campaign manager so [website operators] can use the data to analyze [their] website's conversion flows and optimize [their] ad campaigns."[27] As LinkedIn boasts, "[t]he Insight Tag unlocks powerful demographic insights about [ ] website visitors, including their job titles, companies, industries, and more."[28]

51.     The LinkedIn Insight Tag creates and uses several cookies to track users. One key cookie is the "bcookie," which is a "[b]rowser identifier cookie to uniquely identify devices accessing LinkedIn," whether the user is a LinkedIn

---

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

member or not.[29] This cookie functions as a persistent identifier that allows LinkedIn to recognize returning visitors to the websites where it is installed, such as Costar's Websites, for a year.[30]

52.    For users who are not logged into LinkedIn, the bcookie – in combination with IP address tracking – allows LinkedIn to persistently identify and track individual devices across multiple websites and browsing sessions, creating detailed behavioral profiles based on location and browsing habits, both on the Websites and across the internet from other websites that have implemented the LinkedIn Insight Tag.

53.    For users who are logged into LinkedIn on the browser which they use to access a website, the tracking is even more extensive. When a logged-in LinkedIn user visits the CoStar Websites, the HTTP requests sent to LinkedIn contain additional cookies such as "lms_ads" and "lms_analytics." Each of these cookies is used by LinkedIn "to identify LinkedIn Members off LinkedIn" for analytics or advertising purposes.[31] Thus, these cookies allow LinkedIn to connect the information collected from CoStar Websites directly to the user's LinkedIn profile.

54.    The following is a screenshot demonstrating the operation of LinkedIn's cookies while browsing on Apartments.com – specifically, the

---

[29] https://www.linkedin.com/legal/l/cookie-table (last visited Apr. 29, 2025).
[30] *Id.*
[31] *Id.*

identifying "bcookie" installed on the user's browser:



55.    The following is a screenshot demonstrating the operation of LinkedIn's cookies while browsing on Homes.com – specifically, the identifying "bcookie" installed on the user's browser:



**The Trade Desk/Adsrvr**

56.     Another third-party tracker installed by Defendant on one or more of its Websites, including Apartments.com, is The Trade Desk/Adsrvr.

57.     The Trade Desk is a digital advertising buying platform that "help[s] advertisers around the world plan, launch, and optimize digital advertising campaigns with industry-leading results."[32]

58.     One of the ways that The Trade Desk does that is by collecting and processing various data from user interactions with websites and digital ads that are either part of its network or have integrated with its platform.[33]

59.     The Trade Desk uses pixels and cookies, among other technologies, to collect this data.[34] When a user visits a website that uses The Trade Desk's services, such as Apartments.com and one or more of CoStar's other Websites, The Trade Desk sets a tracking cookie in the user's browser. The Trade Desk's cookie domain is adsrvr.org, and he Trades Desk cookie is called "The Trade Desk ID," or TDID.[35]

60.     The TTID cookie allows The Trade Desk to obtain unique cookie identifiers, device advertising identifiers, IP addresses, interest and demographic

---

[32]     https://assets.thetradedesk.com/assets/documents/240917_TTD_FactSheet.pdf (last visited Apr. 29, 2025).

[33] https://www.thetradedesk.com/legal/privacy (last visited Apr. 29, 2025).

[34] *Id.*

[35] *Id.*

information stored or used by clients and partners, information about browsers and devices such as type, version and settings, location information based on IP addresses, information about ads that are shown to users, and hashed email addresses and other identifying information.[36]

61.    As stated in The Trade Desk's privacy policy, cookies "allow us to recognize web browsers across sites and over time, and therefore to record information about them over time."[37]

62.    Because the TDID cookie enables The Trade Desk to collect and store browsing data, The Trade Desk is able to deliver advertisements based on users' interests and behaviors.

---

[36] *Id.*

[37] *Id.*

63.    Below is a demonstration of the operation of The Trade Desk/Adsrvr cookies while browsing on Apartments.com – specifically, the TDID cookie installed on the user's browser:



64.    The data collected by The Trade Desk helps it to, *inter alia*, measure and increase the effectiveness of ad campaigns, to "match particular ad views to subsequent actions taken by a user," and help "target" advertising.[38]

**Plaintiffs' Experiences**

Plaintiff Dywanna Drummer

65.    Plaintiff Dywanna Drummer has visited the Apartments.com website numerous times on her mobile phone to search for apartments, including on or about February 8, 2025.

66.    Ms. Drummer has a TikTok account, and had one at the time of her visits to Apartments.com.

67.    Ms. Drummer has a LinkedIn account, and had one at the time of her visits to Apartments.com.

68.    On information and belief, during Ms. Drummer's visits to Apartments.com, Defendant caused one or more of the Trackers to be installed on her browser, and Defendant used the Trackers to collect Ms. Drummer's personal information, including her IP address.

69.    When Ms. Drummer visited Apartments.com, she was unaware of Defendant's tracking practices.

---

[38] *Id.*

70.    Ms. Drummer did not provide consent prior to the installation of the Trackers on her browser.

71.    Defendant did not obtain a court order before installing or using the Trackers on Ms. Drummer's browser.

<u>Plaintiff Schalise Lee</u>

72.    Plaintiff Schalise Lee visits the Apartments.com website to search for apartments once or twice a month, usually on her mobile phone but sometimes on her computer. Ms. Lee's most recent visit to the Apartments.com website was in February 2025 on her mobile phone.

73.    On information and belief, during Ms. Lee's visits to Apartments.com, Defendant caused one or more of the Trackers to be installed on her browsers, and Defendant used the Trackers to collect Ms. Lee's personal information, including her IP address.

74.    When Ms. Lee visited Apartments.com, she was unaware of Defendant's tracking practices.

75.    Ms. Lee did not provide consent prior to the installation of the Trackers on her browsers.

76.    Defendant did not obtain a court order before installing or using the Trackers on Ms. Lee's browsers.

<u>Plaintiff Cynthia Rubio</u>

77.    Plaintiff Cynthia Rubio has visited the Apartments.com website numerous times on her mobile telephone to search for apartments, including on or about January 27, 2025.

78.    Ms. Rubio has a TikTok account, and had one at the time of her visits to Apartments.com.

79.    Ms. Rubio has a LinkedIn account, and had one at the time of her visits to Apartments.com.

80.    On information and belief, during Ms. Rubio's visits to Apartments.com, Defendant caused one or more of the Trackers to be installed on her browser, and Defendant used the Trackers to collect Ms. Rubio's personal information, including her IP address.

81.    At the time Ms. Rubio visited Apartments.com, she was unaware of Defendant's tracking practices.

82.    Ms. Rubio did not provide consent prior to the installation of the Trackers on her browser.

83.    Defendant did not obtain a court order before installing or using the Trackers on Ms. Rubio's browser.

<u>Plaintiff Mary Lee Wallace</u>

84.    Plaintiff Mary Lee Wallace visits the Homes.com website on a weekly

basis on her mobile phone to look for homes in the Chesapeake Bay area, including on or about January 25, 2025.

85.    On various occasions after she has visited Homes.com, Ms. Wallace has noticed advertisements for the same or similar properties as ones she has been looking at popping up on other websites and apps.

86.    In addition, on March 28, 2025, after searching Homes.com, a Homes.com popped up on a games app on Ms. Wallace's phone featuring a realtor from Virginia – near where she had previously been looking for homes.

87.    On information and belief, during Ms. Wallace's visits to Homes.com, Defendant caused one or more of the Trackers to be installed on her browser, and Defendant used the Trackers to collect Ms. Wallace's personal information, including her IP address.

88.    When Ms. Wallace visited Homes.com, she was unaware of Defendant's tracking practices.

89.    Ms. Wallace did not provide consent prior to the installation of the Trackers on her browser.

90.    Defendant did not obtain a court order before installing or using the Trackers on Ms. Wallace's browser.

<u>Plaintiff Anthony D'Antonio</u>

91.    Plaintiff Anthony D'Antonio visits the Homes.com website a few times

a year on his computer to search for homes.

92.    Mr. D'Antonio's most recent visit to the Homes.com website was on or about March 3, 2025.  While on Homes.com, Mr. D'Antonio conducted several searches.

93.    Mr. D'Antonio has a LinkedIn account and had one at the time of his visits to Homes.com.

94.    Several days after his March 3, 2025, visit to Homes.com, Mr. D'Antonio visited the website RollingStone.com on his computer and saw an advertisement pop up from Homes.com for the exact same home he had previously been looking at on Homes.com.

95.    On information and belief, during Mr. D'Antonio's visits to Homes.com, Defendant caused one or more of the Trackers to be installed on his browser, and Defendant used the Trackers to collect Mr. D'Antonio's personal information, including his IP address.

96.    When Mr. D'Antonio visited Homes.com, he was unaware of Defendant's tracking practices.

97.    Mr. D'Antonio did not provide consent prior to the installation of the Trackers on his browser.

98.    Defendant did not obtain a court order before installing or using the Trackers on Mr. D'Antonio's browser.

## CLASS ACTION ALLEGATIONS

99.   Plaintiffs bring this lawsuit as a class action on behalf of themselves and, pursuant to Federal Rule of Civil Procedure 23, on behalf of all those similarly situated. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

100.   Plaintiffs propose the following Class, consisting of and defined as follows:

> All California residents who accessed Apartments.com, Homes.com, and/or any other website operated by CoStar and had their IP addresses and/or other personal information collected by third-party trackers during the relevant time period.

101.   Excluded from the Class are Defendant, its subsidiaries, parents, successors, predecessors, assigns, agents, affiliates, and any entity or division in which Defendant has a controlling interest; current or former employees, officers and directors of Defendant; and the Judge to whom this case is assigned and the Judge's staff. Plaintiffs reserve the right to redefine the Class and to add subclasses as appropriate based on discovery and specific theories of liability.

102.   **Numerosity**: The Class Members are so numerous that joinder of all members would be unfeasible and impractical. The membership of the entire Class is currently unknown to Plaintiffs at this time; however, given that, on information and belief, Defendant has millions of visitors to its Websites, it is reasonable to presume that the number of Class members is in the thousands. The exact identities

of Class Members may be ascertained by the records maintained by Defendant.

103. **Commonality**: There are common questions of law and fact as to Class Members that predominate over questions affecting only individual members, including, but not limited to:

A. Whether the Trackers are pen registers as defined by law;

C. Whether Defendant had consent from Plaintiffs and Class members to track their IP addresses or other personal information; and

D. Whether Defendant sought or obtained a court order to utilize the Trackers on its Websites.

104. **Typicality**: Plaintiffs' claims are typical of the claims of the Class because Plaintiffs, like all Class Members, visited one of the Websites and had their IP addresses and other personal information collected by the Trackers.

105. **Adequacy**: Each Plaintiff is qualified to, and will, fairly and adequately protect the interests of each Class Member with whom they are similarly situated, as demonstrated herein. Plaintiffs' attorneys, the proposed class counsel, are experienced in handling consumer and other class actions.

106. **Predominance**: Questions of law or fact common to the Class Members predominate over any questions affecting only individual members of the Class. The elements of the legal claims brought by Plaintiffs and Class Members are capable of proof at trial through evidence that is common to the Class rather than

individual to its members.

107. **Superiority**: A class action is a superior method for the fair and efficient adjudication of this controversy because class-wide damages are essential to induce Defendant to comply with California law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.

## CAUSES OF ACTION

### COUNT ONE

### VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT CAL. PENAL CODE § 638.51

108. Plaintiffs repeat, re-allege, and incorporate by reference, the preceding paragraphs above as if fully set forth herein.

109. California Penal Code Section 638.51 prohibits any person from using a "pen register" without a court order or consent.

110. The statute defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted,

but not the contents of a communication." CAL. PENAL CODE § 638.50(b).

111.    The Trackers are "pen registers" because they are devices or processes that captured "the routing, addressing, or signaling information" – the IP addresses – from the electronic communications transmitted by Plaintiffs' computers and/or mobile devices. CAL. PENAL CODE § 638.51(a).

112.    Defendant installed the Trackers on Plaintiffs' browsers and used the Trackers to collect Plaintiffs' IP addresses and other personal information and to track Plaintiffs.

113.    IP addresses constitute routing and addressing information and do not reveal the contents of the communications between users and the Websites.

114.    Plaintiffs did not provide their consent prior to Defendant's installation or use of the Trackers on their browsers.

115.    Defendant was not authorized by any court order to use a pen register to track Plaintiffs' and Class members' IP addresses and other personal information.

116.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request that this Court:

A. Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class defined above;

B. Appoint Plaintiffs as the representatives of the Class and their counsel as Class counsel;

C. Award statutory damages to Plaintiffs;

D. Award reasonable attorneys' fees and costs to Plaintiffs;

E. Award pre-judgment and post-judgment interest on such monetary relief; and

F. Grant such further relief that this Court deems appropriate.

## **JURY DEMAND**

Plaintiffs, on behalf of themselves and the putative Class, demand a trial by jury on all issues so triable.

DATED: April 30, 2025                    **KAHN SWICK & FOTI, LLC**

                                         By: */s/ Kim E. Miller*

                                         Kim E. Miller (SBN 178370)
                                         kim.miller@ksfcounsel.com
                                         1901 Avenue of the Stars, 2nd Floor
                                         Los Angeles, California  90067
                                         Telephone: (504) 455-1400

                                         Lewis Kahn
                                         lewis.kahn@ksfcounsel.com
                                         Melissa H. Harris*
                                         melissa.harris@ksfcounsel.com
                                         1100 Poydras Street, Suite 960
                                         New Orleans, LA 70163
                                         Telephone: (504) 455-1400

                                         **DON BIVENS PLLC**
                                         Don Bivens
                                         don@donbivens.com
                                         Teresita T. Mercado*
                                         teresita@donbivens.com
                                         15169 N. Scottsdale Road, Suite 205
                                         Scottsdale, AZ 85254
                                         Telephone: (602) 762-2661

                                         *Counsel for Plaintiffs and the Putative Class*

                                         *Application for *pro hac vice* admission
                                         forthcoming